Janice M. Bellucci, Cal. SBN 108911
(JMBellucci@aol.com)
LAW OFFICE OF JANICE M. BELLUCCI
2110 K Street
Sacramento, CA 95816
Tel:  (805) 896-7854
Fax:  (916) 823-5248

Attorney for Plaintiff
Jermaine Demel Dickerson

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERMAINE DEMEL DICKERSON, an individual, | Case No.:  3:22-cv-3375 |
| Plaintiff, | **COMPLAINT** |
| vs. | DEMAND FOR JURY TRIAL |
| CONTRA COSTA COUNTY, California; and DAVID E. GOLDSTEIN, an individual, | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.     In December 1998, while an Assistant Public Defender for Contra Costa County, California, Defendant David E. Goldstein recommended that his client, Plaintiff Jermaine Demel Dickerson ("**Mr. Dickerson**"), an 18-year-old homeless African American youth and special education high school student, plead no contest to a violent rape of a minor that he did not commit, and for which there was no physical evidence.

2.     The sole basis for the charge against Mr. Dickerson was his false identification by the complaining witness, Nataki Perry, then known as Nataki Rasheed ("**Ms.**

**Perry**").  Ms. Perry was at the time 15 years old and a former classmate of Mr. Dickerson.  Ms. Perry told police that Mr. Dickerson raped her at knifepoint for between "30 and 60 minutes" on the grounds of the high school they had both attended.  However, at the time he recommended that Mr. Dickerson plead no contest to the charge of forcible rape, Defendant Goldstein possessed multiple forensic and medical reports confirming the absence of evidence of *any* rape, much less a violent rape lasting between 30 and 60 minutes.  In the later estimation of another Assistant Public Defender with the Contra Costa County Public Defender's Office, the forensic evidence itself "undermine[d] the conviction."

3.      Furthermore, at the time he recommended that Mr. Dickerson plead no contest to forcible rape, Defendant Goldstein also possessed police reports revealing inconsistencies in Ms. Perry's account of the alleged rape, which rendered both her identification of Mr. Dickerson and her rape claim highly impeachable at trial.

4.      Moreover, at the time he recommended that Mr. Dickerson plead no contest, Defendant Goldstien possessed, but upon information and belief, failed to adequately develop for trial, alibi evidence and witness testimony confirming that Mr. Dickerson was in fact in another city at the time of the alleged rape.

5.      Most significantly, Defendant Goldstein was also aware that Mr. Dickerson consistently and fervently protested his innocence.

6.      Despite possessing overwhelming evidence of Mr. Dickerson's innocence, including significant impeachment evidence against Ms. Perry, Defendant Goldstein waited until the eve of trial to recommend that Mr. Dickerson plead no contest to the false charge of forcible rape against him.  Upon information and belief, Defendant Goldstein made this recommendation because he had failed to prepare adequately for Mr. Dickerson's defense at trial, including, upon information and belief, by failing to interview alibi witnesses, failing to develop additional alibi evidence, and failing to prepare expert testimony regarding the exculpatory forensic evidence.  In addition, Defendant Goldstein pressured Mr. Dickerson to accept a no contest plea by

appealing to Mr. Dickerson's desire to be free after eight months in custody, emphasizing that a no contest plea would secure Mr. Dickerson's release "that night." However, Defendant Goldstein deprived Mr. Dickerson of competent advice in connection with his no contest plea by predicting that Ms. Perry's false identification of Mr. Dickerson would result in conviction and a sentence of 15 years to life, without explaining how the manifest evidence of Mr. Dickerson's innocence – including but not limited to exculpatory forensic evidence – would affect his chances at trial.  Defendant Goldstein also failed to explain to Mr. Dickerson the lifetime of ignominy, economic hardship, and personal difficulties that would plague Mr. Dickerson if he falsely pled to violently raping a minor.

7.      In reliance upon Defendant Goldstein's defective recommendation, Mr. Dickerson pleaded no contest to one count of violating California Penal Code section261(a)(2) (Forcible Rape), with a Penal Code section 12022.3(a) enhancement for use of a deadly weapon, despite having committed no crime against Ms. Perry. People v. Dickerson, (Super. Ct. of Cal., County of Contra Costa, Case No. 05-981014-4.)  See Exh. A.

8.      Over 14 years later, in May 2012, Ms. Perry fully recanted her allegations against Mr. Dickerson and admitted Mr. Dickerson's innocence.  See Exh. A.  On or about June 7, 2012, Mr. Dickerson advised Defendant Goldstein – who was still employed as an Assistant Public Defender for Contra Costa County – of Ms. Perry's recantation and sought his assistance in overturning the conviction for forcible rape. On July 31, 2012, at Defendant Goldstein's request, an investigator from the Contra Costa County Public Defender's Office interviewed Ms. Perry and confirmed that Ms. Perry's accusations against Mr. Dickerson were false.  However, Defendant Goldstein soon ceased communicating with Mr. Dickerson, and pursued no relief on his behalf.

9.      In 2019, after seven years of persistence by Mr. Dickerson, a different Assistant Public Defender for Contra Costa County agreed to bring a motion to vacate Mr. Dickerson's no contest plea and conviction, *nunc pro tunc*, pursuant to California

Penal Code section 1473.7(a)(2) on the grounds of actual innocence.  See Exh. A. The motion was heard and granted by the Superior Court of California, County of Contra Costa, on September 24, 2021 – more than nine years after Mr. Dickerson first advised Defendant Goldstein of the new evidence of his innocence.  Exh. B.  The Court also granted the People's motion to dismiss remaining counts against Mr. Dickerson, *nunc pro tunc*, in the interest of justice pursuant to California Penal Code section 1385.  Exh. B.

10.     On December 14, 2021, in compliance with the California Government Claims Act, Mr. Dickerson submitted a claim for damages to Contra Costa County.  Exh. C. The County denied the Claim on December 20, 2021, necessitating this action.  Exh. D.

## JURISDICTION

11.     The United States District Court has subject matter jurisdiction over Plaintiff's state law professional negligence claim pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because Mr. Dickerson is a citizen of the State of Nevada, while each Defendant is a citizen of the State of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## DIVISIONAL ASSIGNMENT

12.     Venue is proper within the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(e) because Defendants are located within this District, and because a substantial part of the events giving rise to the claims occurred in this District.

13.     Pursuant to the Court's Local Rule 3-2(c)-(d) and General Order No. 44, this action is to be assigned to either the San Francisco Division or the Oakland Division because the action arose in Contra Costa County.

**PARTIES**

14.   Mr. Dickerson realleges and incorporates herein, as though fully set forth, all and inclusively, paragraphs 1 through 13.

15.   Plaintiff Jermaine Demel Dickerson ("**Mr. Dickerson**"), an individual, is a citizen of the State of Nevada.

16.   Defendant Contra Costa County (the "**County**") is a county organized and operating under the laws of the State of California, which is a citizen of the State of California for the purposes of federal diversity jurisdiction.  Moor v. Alameda County, 411 U.S. 693, 720-21 (1973); Woidtke v. St. Clair County, Illinois, 335 F.3d 558, 560 (7th Cir. 2003).  Pursuant to California Government Code section 815.2, Defendant Contra Costa County is vicariously liable under a state law professional negligence theory for the actions of Defendant Goldstein and other Assistant Public Defenders employed by the County and/or the Contra Costa County Public Defender's Office, because Defendant's Goldstein's negligent representation of Mr. Dickerson was within the scope of his employment by the County, and because California law provides no immunity for public defenders for malpractice claims arising from actions in the scope of their employment.  Barner v. Leeds, 24 Cal. 4th 676, 690-692 (2000).  In addition, Defendant Contra Costa County is directly liable to Mr. Dickerson by virtue of its statutory duty to provide competent representation to Mr. Dickerson in People v. Dickerson.

17.   Defendant David E. Goldstein ("**Goldstein**") is an individual who was employed by the Contra Costa County and/or the Contra Costa County Public Defender's Office between at least the years 1998 and 2015, and is sued in that capacity only.  Defendant Goldstein represented Mr. Dickerson as his Assistant Public Defender in and throughout the criminal action captioned People v. Dickerson, (Super. Ct. of Cal., County of Contra Costa, Case No. 05-981014-4.)  Upon information and belief, Defendant David E. Goldstein was the sole Assistant Public Defender appointed to represent Mr. Dickerson through the period of Mr. Dickerson's

plea and sentencing in <u>People v. Dickerson</u>, and at all times relevant to this action acted within the scope of his employment as an Assistant Public Defender employed by the County.  Defendant Goldstein is a citizen of the State of California.

## **FACTS**

18.     Mr. Dickerson realleges and incorporates herein, as though fully set forth, each and every, all and inclusively, paragraphs 1 through 17.

### **Mr. Dickerson's Background**

19.     Plaintiff Jermaine Demel Dickerson, born January 23, 1980, is an African American who spent nearly all of his youth in foster care.  Removed from his parent's care at the age of four, Mr. Dickerson spent the next 13 years (until age 17) in 32 separate foster and group home placements.  Mr. Dickerson was not under the care of his father, whose identity is unknown.

20.     During his senior year at El Cerrito High School in 1997-1998, Mr. Dickerson was placed in a special needs class to remediate the educational progress he lost as a result of his various moves within the foster care system.

21.     In approximately February 1998, Mr. Dickerson was expelled from El Cerrito High School for bringing marijuana on campus.  Mr. Dickerson then left his group home, becoming homeless.  Mr. Dickerson often slept on the street or in motel rooms rented for short periods of time.

22.     Mr. Dickerson never visited the campus of El Cerrito High School after being expelled in February 1998, at least two months prior to the alleged rape.

### **Ms. Perry Falsely Accuses Mr. Dickerson of Rape**

23.     On April 20, 1998, 15-year-old Nataki Rasheed, now known as Nataki Perry, visited the El Cerrito Police Department in Contra Costa County.  Ms. Perry told police that Mr. Dickerson, then 18 years old, had raped her at knifepoint and stole her personal property, including a necklace and earrings.  The following allegations are taken from the records of Ms. Perry's statements to the El Cerrito Police Department

on April 20 and 21, 1998, as well as a preliminary hearing in <u>People v. Dickerson</u> on June 19, 1998:

a.    Ms. Perry claimed that she finished her classes at El Cerrito High School at 3:20 p.m. and remained on campus to speak briefly with her music teacher.

b.    Ms. Perry claimed that she thereafter left campus with a friend and began walking north on a sidewalk where she encountered two other friends, with whom she spoke for a few minutes.

c.    Ms. Perry claimed that her friends then left, and Ms. Perry resumed walking alone.

d.    Ms. Perry claimed that, while walking alone, she saw Mr. Dickerson walking toward her at about 3:45 p.m.  Ms. Perry claimed that Mr. Dickerson stopped her and began speaking about a P.E. class they had taken together before Mr. Dickerson dropped out of school.

e.    To the police, Ms. Perry claimed that this initial conversation between her and Mr. Dickerson became sexual.  Specifically, to the police, Ms. Perry claimed that Mr. Dickerson began hugging and touching Ms. Perry, and stated that he wanted to have sex with her, to which Ms. Perry replied that she did not want to have sex with him. However, during the preliminary hearing, Ms. Perry denied that the conversation was sexual, and denied telling the police the same.

f.    Ms. Perry claimed that, after their initial conversation on the street, Mr. Dickerson asked Ms. Perry to follow him so that he could "show [her] something."  Ms. Perry claims that she complied, despite Mr. Dickerson being a virtual stranger.

g.    Ms. Perry claimed that Mr. Dickerson led her back to the campus of El Cerrito High School and invited her to enter a dirt field behind the school's music building.  The dirt field was surrounded on three sides by

a chain-link fence.  One side of the fence is adjacent to Eureka Avenue, making the field visible from that street and from the sidewalk adjacent to the field.   Ms. Perry claimed that Mr. Dickerson hopped the fence to the field, and that Ms. Perry entered the field through an opening in the fence.

h.     Ms. Perry claimed that, once inside, Mr. Dickerson sat on the dirt and asked Ms. Perry to do the same.  Ms. Perry declined and stated that she must leave.  Ms. Perry claimed that Mr. Dickerson then physically pushed Ms. Perry into a seated position on the dirt.

i.     Ms. Perry claimed that Mr. Dickerson then lay on top of her, pulled down her pants and underwear, and then pulled down his own pants and underwear.  Ms. Perry claimed that she yelled for Mr. Dickerson to stop, but that Mr. Dickerson produced a knife and threatened to "cut her" if she did not stop yelling.  Ms. Perry claimed that Mr. Dickerson at one point pushed the side of her face into the ground, which soon produced swelling on her face.

j.     To the police, Ms. Perry claimed that Mr. Dickerson then raped her by forcing his penis inside her vagina "for 30-60 minutes."  Ms. Perry's timeline put the start of this violent attack at or after 4:00 p.m.  During the preliminary hearing, Ms. Perry claimed that Mr. Dickerson raped her for 30 minutes, in an attack that began about 4:00 p.m.  During the preliminary hearing, Ms. Perry specified that Mr. Dickerson withdrew his penis and reentered her vagina two times during the 30-minute period.  Ms. Perry claimed that the rape was forceful and caused lingering pain.  Ms. Perry claimed that Mr. Dickerson eventually became frustrated and stopped, and warned Ms. Perry not to tell anyone.

k.     Ms. Perry claimed that she exited the dirt field before Mr. Dickerson by climbing the fence, and that she jogged westbound on

Stockton Avenue.  Ms. Perry claimed that Mr. Dickerson caught up with her, stopped her, and demanded that Ms. Perry surrender her backpack, shoes, and jewelry.  Ms. Perry claimed that she surrendered the property to Mr. Dickerson.  To the police, Ms. Perry claimed that the robbery occurred behind a Subway restaurant.  However, in the preliminary hearing, Ms. Perry claimed that Mr. Dickerson robbed her in the "BART Path" away from any building.

l.      To the police, Ms. Perry claimed that Mr. Dickerson then left, and that Ms. Perry first ran to a pizza restaurant, and then to a Kragen Auto Parts store.  At the preliminary hearing, however, Ms. Perry claimed that she went straight to Kragen, and did not stop at a pizza restaurant.

m.      Finally, Ms. Perry claimed that, once at the Kragen Auto Parts store, she telephoned her parents and waited there approximately two hours until her father picked her up.

24.      On April 22, 1998, Ms. Perry was shown a photographic line-up that included Mr. Dickerson's photo.  Ms. Perry pointed to Mr. Dickerson's photo and said, "looks like him."  Ms. Perry identified certain tattoos on Mr. Dickerson's body, and claimed that he wore a nose ring during the assault.

**Ms. Perry Gave Witnesses At Least Two Conflicting Accounts of her Whereabouts On April 20, 1998 that Did Not Involve Rape or any Allegation Against Mr. Dickerson**

25.      On the day of the alleged rape, April 20, 1998, Ms. Perry gave witnesses conflicting accounts of her whereabouts that did not involve rape or any allegation against Mr. Dickerson.  Ms. Perry's interactions with these witnesses suggest that Ms. Perry's true motive for alleging rape was to avoid punishment by her parents for arriving home late from school.

26.      During the preliminary hearing, Ms. Perry admitted that her parents required her to return home immediately after school, but that she was "often" in trouble for

1   being late and lying about her whereabouts.  In fact, Ms. Perry's father had recently

2   grounded her for a month after she returned home late and lied about it.

3   27.     In addition, Ms. Perry's brother told police that Ms. Perry "called home earlier

4   in the day after school and told him to tell dad that she was in the bathroom if he

5   called," suggesting that Ms. Perry had always planned to spend her afterschool time at

6   a place of which her parents disapproved.

7   28.     Ms. Perry made her first conflicting statement to the employees of the Kragen

8   Auto Parts store where she went after the alleged rape.  The Kragen employees

9   reported that:

10          a.      Ms. Perry entered the Kragen store use the telephone to call her

11          parents to pick her up.

12          b.      As she waited, Ms. Perry told the employees "*that some Crescent*

13          *Park girls jumped her and took her stuff.*"

14          c.      Notably, a police car came into the parking lot of the Kragen Auto

15          Parts store while Ms. Perry waited for her parents.  The Kragen

16          employees asked Ms. Perry if she wished to speak to the officer in the

17          parking lot, but Ms. Perry declined.

18          d.      Ms. Perry's father later arrived at the Kragen Auto Parts, and asked

19          Ms. Perry where she had been.  At least one Kragen employee observed

20          Ms. Perry's father grab her, drag her to the car, and slam her against the

21          car door.  The Kragen employee then heard Ms. Perry's father yell at Ms.

22          Perry to "stop lying" before he drove off with Ms. Perry.

23   29.     When questioned by police, Ms. Perry's father said that, on the evening of

24   April 20, 1998, Ms. Perry "*told him that someone had attacked her and took her stuff.*

25   *She said they tried to get her into a van.*"  Sometime later that night, however, Ms.

26   Perry told her father and stepmother that she was raped by "a boy named Jermaine."

27   Ms. Perry's stepmother likewise told police of Ms. Perry's changing accounts of why

28   she was late, including the eventual allegation of rape.  However, Ms. Perry's

1  stepmother cautioned that Ms. Perry "has made up stories in the past of why she has

2  been late returning home."

3  **The El Cerrito Police Department Investigation Reveals No Evidence to**

4  **Substantiate Ms. Perry's Allegations, Including Forceable Rape**

5  30.    The El Cerrito Police Department investigation revealed no physical evidence

6  to substantiate Ms. Perry's allegations, including but not limited to her claim to have

7  been forcibly raped by Mr. Dickerson, or by any other person.

8  31.    After visiting the El Cerrito Police Station on April 20, 1998,  Ms. Perry was

9  transported to a hospital, where a rape examination was performed.  Ms. Perry told

10  police that she had neither bathed nor cleaned herself since the alleged rape, nor had

11  she changed clothes.

12  32.    Ms. Perry underwent a physical examination, which yielded no evidence of a

13  forceable and painful rape on the ground, in a dirt field, lasting between 30 and 60

14  minutes with at least three instances of forceful penetration.  The report stated:

15         a.    Ms. Perry's "clothes were not torn or soiled."

16         b.    Ms. Perry's pubic area found only a single "superficial abrasion"

17         on her vulva, but "otherwise no findings."

18         c.    The report listed "0 [zero] bruises, cuts, or trauma noted."

19         d.    The report concluded: "*Report of sexual assault, exam reveals: NO*

20         *PHYSICAL FINDINGS*."  (Emphasis added.)

21  33.    Ms. Perry was also examined by Emergency Room physician Dr. Theo

22  Koury, whose conclusions are likewise inconsistent with Ms. Perry's

23  allegations.  Dr. Koury reported: "Normal external genitalia.  There was a very

24  superficial abrasion at the base of the vestibule.  The vaginal mucosa was pink. .

25  . . Cervical os was closed.  No lesions.  There was no intervaginal trauma

26  noted. . . [and] no cervical motion tenderness."

27  34.    A laboratory report of the examination of both Ms. Perry's body and clothing,

28  as well as Mr. Dickerson's clothing, also revealed no evidence of rape or any other

type of sexual assault.  The seminal fluid tests of Ms. Perry's vaginal and rectal swabs contained only one sperm cell, and DNA testing confirmed that Mr. Dickerson was not the source.  The stains on Ms. Perry's clothing contained no sperm, and in fact contained only her DNA.  Likewise, stains found on Mr. Dickerson's clothing did not contained DNA from Ms. Perry.

35.     Nor did police find evidence at the alleged scene of the rape the morning after it allegedly occurred.  Specifically, on the morning of April 21, 1998 a detective from the El Cerrito Police Department visited the dirt lot behind the music building at El Cerrito High School.  The detective noted that "the lot is composed of dirt and weeds," and that "the chain fence [surrounding the lot] is in plain view from the street providing visibility into the vacant lot area."  The detective "conducted a visual inspection of the scene and located no signs of evidence."

36.     In addition, the El Cerrito Police Department located no witnesses to the alleged violent 30-60 minute rape, despite it occurring on school campus, shortly after the end of the school day, in a dirt lot that is visible from a street and sidewalk, while Ms. Perry allegedly yelled and screamed.

**Mr. Dickerson's Alibi Evidence and Alibi Witnesses**

37.     Mr. Dickerson at all times maintained that he was never on or even near the campus of El Cerrito High School on April 20, 1998.  In addition, Mr. Dickerson at all times maintained that he had no contact with Ms. Perry on that day, or any day after he dropped out of school in February 1998.  In response to police inquiry regarding why Ms. Perry would identify him, Mr. Dickerson speculated that Ms. Perry probably knew him from their P.E. class together, where she would have seen his tattoos and nose ring.  However, Mr. Dickerson stressed that the nose ring Ms. Perry claimed he wore during the alleged rape was lost months before April 20, 1998, and that he no longer possessed it.

38.     The El Cerrito Police Department report noted that Mr. Dickerson "was very upset about the allegations" and "kept saying that he knew nothing about it and that

1   he was being framed."  Mr. Dickerson maintained that he was visiting his brother's

2   residence in Richmond on April 20, 1998, and that he was present at that residence

3   early in the day.  At approximately, 3:00 p.m. that day, Mr. Dickerson went to the Del

4   Norte BART Station and took the BART train to a station in Berkeley, where he met

5   his girlfriend, Angel Carone.  Notably, 3:00 p.m. is well before Ms. Perry was

6   released from her classes at school, and thus well before the time she claimed to have

7   been assaulted at or after 4:00 p.m.  Mr. Dickerson also stated that he and his

8   girlfriend then took the BART train from the Berkeley station to San Francisco where

9   they spent the balance of the afternoon watching a movie.

10  39.     Angel Carone, Mr. Dickerson's then-girlfriend, corroborated Mr. Dickerson's

11  alibi when she likewise told the El Cerrito Police Department that she met Mr.

12  Dickerson at the Berkeley BART Station that afternoon, and that she was with him

13  from then on.  Ms. Carone's testimony was thus consistent with Mr. Dickerson's

14  alibi, and inconsistent with Mr. Dickerson meeting and assaulting Ms. Perry at around

15  4:00 p.m.

16  40.     A witness statement from Billy Drinkwater likewise supported Mr. Dickerson's

17  account.  Mr. Drinkwater told the El Cerrito Police Department that he saw Mr.

18  Dickerson at the Del Norte BART Station between approximately 3:00 p.m. and 4:00

19  p.m., which is consistent with Mr. Dickerson's account of his alibi, and inconsistent

20  with Mr. Dickerson meeting and assaulting Ms. Perry at or after 4:00 p.m.

21  41.     On April 22, 1998, after his arrest, Mr. Dickerson freely consented to a search

22  of his brother's residence, where he had stayed on April 20, 1998.  The search yielded

23  no evidence, including none of Ms. Perry's allegedly stolen property.

24  **Defendant Goldstein and the Contra Costa County Public Defender's Office**

25  **Possessed Substantial Evidence of Mr. Dickerson's Innocence**

26  42.     After his arrest on or about April 22, 1998, Mr. Dickerson was booked at the

27  Contra Costa County jail in Martinez.  Mr. Dickerson could not raise funds to make

28  his $150,000 bail and therefore remained in custody for the eight months between his

1  arrest and release from custody on or about December 4, 1998.  Mr. Dickerson had no

2  support and no visitors during this time, except a handful of visits from his mother.

3  Mr. Dickerson's custodial setting was hostile and frightening, as many of Mr.

4  Dickerson's fellow inmates were hardened criminals with violent histories who were

5  many years older than the 18-year-old Mr. Dickerson.

6  43.    On or about April 24, 1998, the Conta Costa County District Attorney's Office

7  charged Mr. Dickerson with the following in the action captioned People v.

8  Dickerson, Super. Ct. of Cal., County of Contra Costa Case No. 05-981014-4:

9  (i) one felony count of violating Penal Code section 261(a)(2) (Forcible Rape), with a

10  section 12022.3(a) enhancement for using a deadly weapon in the commission of a

11  specified sex offense; and (ii) one felony count of violating Penal Code section 211

12  (Robbery).

13  44.    While in custody, Mr. Dickerson was contacted by Defendant Goldstein who

14  identified himself as Mr. Dickerson's Assistant Public Defender.  Defendant

15  Goldstein was the sole Assistant Public Defender with whom Mr. Dickerson

16  communicated throughout the duration of his prosecution.  Defendant Goldstein

17  visited Mr. Dickerson no more than four times during the entire eight-month period

18  prior to Mr. Dickerson's plea.

19  45.    During all communications with Defendant Goldstein, Mr. Dickerson

20  maintained his innocence and asserted his desire to clear his name at trial.  In

21  addition, Mr. Dickerson provided Defendant Goldstein with information regarding his

22  whereabouts during the alleged assault, as well as the name of Angel Carone, his alibi

23  witness.

24  46.    The Contra Costa County Public Defender's Office has admitted that "Ms.

25  Perry's false allegation was the only evidence the prosecution offered at the

26  preliminary hearing," and was thus the only evidence presented against Mr.

27  Dickerson.  Exh. A, at 12.

28

47.     Upon information and belief, neither Defendant Goldstein nor any other employee or agent of the Contra Costa County Public Defender's Office adequately investigated Mr. Dickerson's alibi, including by failing to interview Angel Carone, Bobby Drinkwater, and other possible alibi witnesses.

48.     Upon information and belief, prior to recommending Mr. Dickerson's no contest plea, both Defendant Goldstein and the Contra Costa County Public Defender's Office had in their possession evidence of both Mr. Dickerson's innocence as well as Ms. Perry's lack of credibility and/or the falsity of her accusations against Mr. Dickerson, by which Ms. Perry's testimony could have been effectively impeached at trial, including but not limited to:

a.     The complete lack of physical evidence consistent with a rape, or of any sexual contact whatsoever, much less a violent and painful rape alleged to last between 30-60 minutes.

b.     The absence of damage to or dirt in or on Ms. Perry's hair, skin, and clothes consistent being pinned down in the dirt for 30-60 minutes.

c.     The absence of Mr. Dickerson's DNA on Ms. Perry's clothes or person, and the corresponding absence of Ms. Perry's DNA on Mr. Dickerson's clothes or person;

d.     The absence of any evidence of sexual assault in the dirt lot when police searched it the next morning.

e.     The absence of witnesses to an assault allegedly lasting 30-60 minutes on a school campus, soon after the conclusion of school, in broad daylight and in an open field that was visible from a sidewalk and a street.

f.     Ms. Perry's inconsistent reports to witnesses that she had been "jumped" by neighborhood girls, and/or was the victim of a kidnapping attempt involving a van.

g.     The conflicting details between Ms. Perry's statements to the El Cerrito Police Department and her testimony during the preliminary hearing, as pleaded above.

h.     Ms. Perry's refusal to speak to the police officer who arrived outside of the Kragen Auto Parts store while she waited for her parents shortly after the alleged assault.

i.     The implausibility of Ms. Perry having voluntarily followed Mr. Dickerson, a virtual stranger, after he had engaged in unwanted touching and hugging, and affirmatively stated that he wanted to have sex with her.

j.     Ms. Perry's admitted motive to lie about her whereabouts in hopes of escaping her father's punishment for being late home from school.

49.     In addition, upon information and belief, prior to recommending Mr. Dickerson's no contest plea, both Defendant Goldstein and the Contra Costa County Public Defender's Office had in their possession evidence that Ms. Perry had falsely accused Mr. Dickerson as a means of avoiding punishment by her father for being late home from school.  Such evidence includes, but is not limited to:

a.     Two Kragen Auto Parts store employees who witnessed Ms. Perry's father grab her, throw her against a car, and yell "stop lying."

b.     In response to the allegation that her stepdaughter was raped, Ms. Perry's stepmother cautioned police that Ms. Perry "has made up stories in the past of why she has been late returning home."

50.     Upon information and belief, prior to advising Mr. Dickerson to plead no contest, Defendant Goldstein knew of the inconsistencies in Ms. Perry's allegations, knew of the lack of forensic evidence that Mr. Dickerson committed rape, and knew of other evidence of Mr. Dickerson's innocence, because Defendant Goldstein argued these very points at the June 19, 1998 preliminary hearing in <u>People v. Dickerson</u>. Specifically, Defendant Goldstein argued the following on June 19, 1998:

a.      Ms. Perry had "a powerful motive to lie as to what happened, and for her reasons for not coming late from school, past punishment, serious punishment from her father.  There's evidence from her own testimony that her father was angry with her from the outset, getting there at Kragen's."

b.      "[T]he medical records do not corroborate what she said. . . . [W]e have basically what has been reported as a 30-minute rape, forceful rape, a rape involving pain.  And there's no interior vaginal, cervical, or vulval injuries.  The only thing mentioned in the medical records at all is what's described as a superficial abrasion toward the bottom end of her outer genitals.  That certainly is not consistent whatsoever with a protracted two or three or one penetration rape over the course of 30 minutes where the victim is allegedly struggling, the defendant is allegedly pushing her down, even by her head."

c.      "There is simply no corroborating physical evidence by way of DNA, pubic hair samples, and the description of the injuries does not support what she said."

d.      "[H]er story is internally inconsistent and unbelievable."

e.      "We have absolutely nothing to corroborate the witness's or the victim's as she's characterized, version of the events, and it's not because there aren't other parties that the District Attorney can bring to court.  It is because in this instance there is nothing to corroborate."

f.      "Her photo identification was uncertain, and her description of the individual's face does not match the description of the person's face before you in court, by way of the defendant, in terms of spotting, discoloration, blotching."

///

///

**Defendant Goldstein Induces a No Contest Plea by Mr. Dickerson that is Unsubstantiated by Evidence in Defendant Goldstein's Possession**

51.     Upon information and belief, Defendant Goldstein failed to adequately prepare for Mr. Dickerson's defense at trial by failing to investigate Mr. Dickerson's defenses, failing to find and prepare defense witnesses, and failing to investigate and prepare impeachment evidence against Ms. Perry.  In so doing, Defendant Goldstein deprived Mr. Dickerson of competent advice during plea negotiations, and deprived Mr. Dickerson of an effective choice between trying the case and pleading no contest, because Defendant Goldstein waited until the eve of trial to secure Mr. Dickerson's no contest plea.

52.     Specifically, on or about December 4, 1998, on the eve of trial, Defendant Goldstein approached Mr. Dickerson and recommended that he plead no contest to the charge of forcible rape, despite the lack of physical evidence against Mr. Dickerson, and despite evidence available to impeach Ms. Perry's identification of Mr. Dickerson as well as her false claim to have been forcibly raped.

53.     In his 11th-hour discussion with Mr. Dickerson, Defendant Goldstein focused solely upon Ms. Perry's identification of Mr. Dickerson, as well as the lengthy prison term that Defendant Goldstein predicted if Mr. Dickerson went to trial and lost. Defendant Goldstein told Mr. Dickerson that he was likely to lose at trial because Ms. Perry accused him by name, especially if Ms. Perry "cried on the stand" as she had during the preliminary hearing.  However, Defendant Goldstein failed to advise Mr. Dickerson concerning how the absence of physical evidence and witness testimony, as well as Mr. Dickerson's available alibi witnesses and testimony, would impact his chances at trial.

54.     In addition, Defendant Goldstein – with knowledge that Mr. Dickerson had been in custody for nearly eight months, with virtually no family support – encouraged Mr. Dickerson to enter a no contest plea by promising that a no contest plea meant that Mr. Dickerson could be freed "that night" from the frightening and

hostile jail environment.

55.     Although Defendant Goldstein explained that a no contest plea would result in Mr. Dickerson being required to register as a sex offender, Defendant Goldstein did not provide any detail regarding the requirements of and legal restrictions incident to registration, nor did Defendant Goldstein provide information regarding the social and economic burdens, and other collateral consequences, of registration

56.     Despite his innocence, Mr. Dickerson relied upon Defendant Goldstein's advice to enter a no contest plea to one felony count of violating California Penal Code section 261(a)(2) (Forcible Rape), with a Penal Code section 12022.3(a) enhancement for use of a deadly weapon.  Mr. Dickerson entered this plea in solely because:  (i) Mr. Dickerson feared that Defendant Goldstein's manifestly inadequate preparation for trial would result in a conviction; (ii) the long sentence that Defendant Goldstein predicted in the event of a conviction at trial; (iii) Defendant Goldstein's negative evaluation of Mr. Dickerson's chances at trial, and in particular Defendant Goldstein's sole focus on the weight of Ms. Perry's identification of Mr. Dickerson; and (iv) the prospect of release from custody "that night" in exchange for the no contest plea.

**The Aftermath of Defendant Goldstein's Advice to Plead No Contest**

57.     In response to his no contest plea, the Superior Court of California, County of Contra Costa sentenced Mr. Dickerson to nine years in prison, with execution suspended, and placed Mr. Dickerson on three years' formal felony probation.  Mr. Dickerson was immediately required to register as a sex offender under the California Sex Offender Registration Act, Penal Code section 290, *et seq*.  Mr. Dickerson's status as a registered sex offender and his forcible rape conviction were consistently communicated to the general public via the public notification scheme of the Sex Offender Registration Act, including but not limited to the California Megan's Law Website.

58.    Mr. Dickerson's false conviction as a violent rapist, as well as his status as a registered sex offender, which resulted from Defendant Goldstein's deficient advice, had devastating personal, relational, and economic consequences for Mr. Dickerson over the next nearly 23 years until his exoneration on September 24, 2021.

59.    Because of his requirement to register, Mr. Dickerson could not find steady housing, and no person was willing to let him rent or reside with them, including family members.  In addition, because Mr. Dickerson was required to register, Mr. Dickerson could not find employment sufficient to house or otherwise support himself, as his housing and job applications were repeatedly denied.

60.    Between the ages of 24 and 40, Mr. Dickerson could not maintain steady employment because, after he was initially employed at a variety of jobs, the employers would discover Mr. Dickerson's record, and terminate his employment.

61.    Since childhood, Mr. Dickerson aspired to become a truck driver, but all of his applications to trucking school and driving jobs were rejected.

62.    Between the ages of 21 and 24, Mr. Dickerson was homeless and often forced to sleep on the street using dirty cardboard as a mattress, as well as blankets that he stored in luggage hidden in bushes during the daytime.  In colder months, Mr. Dickerson would spend early morning hours riding BART trains or city buses to keep warm until the arrival of commuters and the threat of removal compelled him to return to the cold.

63.    During his years of homelessness, Mr. Dickerson found occasional employment purchasing local newspapers that he attempted to re-sell on the street for a profit.  If he earned sufficient profit from his sales on a given day, Mr. Dickerson could afford to spend the night in a motel.  If he could not earn sufficient profit, as frequently occurred, Mr. Dickerson was forced to exhume his hidden luggage from the bushes, collect his blankets and cardboard, and again sleep on the street.

64.    Mr. Dickerson frequently feared for his safety while living as a homeless person, as he was compelled to forge informal alliances with mentally ill and other

1    dangerous persons to protect himself and his property.

2    65.    Mr. Dickerson endured frequent bouts of depression and suicidal ideation

3    during his lengthy period of homelessness.  Mr. Dickerson also turned to alcohol

4    during the 22 years he was wrongfully convicted, which produced recurring, painful

5    problems with liver function.

6    **Mr. Dickerson's Wife Convinces Ms. Perry to Recant her False Accusation**

7    **Against Mr. Dickerson**

8    66.    On information and belief, on or about May 5, 2012, Mr. Dickerson's then-wife

9    located Ms. Perry on social media and sent her a private message.  Mr. Dickerson's

10   wife encouraged Ms. Perry to "tell the truth" regarding the 1998 allegations against

11   Mr. Dickerson.

12   67.    In response, on or about May 29, 2012, Ms. Perry admitted to falsely accusing

13   Mr. Dickerson, stating:

> I am very appreciative for you reaching out to me. I haven't thought
> about any of this since it happened. Yes, i (sic) was really raped that day
> but i (sic) will handle this ASAP. My intentions were not to take
> someones (sic) life away and i (sic) truly regret the wrong doing i (sic)
> played a part in. Jermaine is a good person and did not deserve any of the
> hardship he has been through. I cant (sic) give him his life back but i (sic)
> can do my part in making things better. I was a very young and ignorant
> girl and i (sic) listened to the wrong people and someone innocent got
> hurt. I give my blessing to you and your family. i (sic) have a family too
> and couldnt (sic) imagine being in this predicament. You have presented
> your self (sic) as a strong woman. i (sic) respect and appreciate that. i
> (sic) am, truly apologetic and will make things as right as possible. i (sic)
> will also stay in contact with you to let you [know] what is going [on]
> with this whole process.

Exh. A, at 6.

**Defendant Goldstein Requests an Investigation Into Ms. Perry's Recantation,**

**but Denies Assistance to Mr. Dickerson Once his Innocence is Confirmed**

68.    Soon after Ms. Perry's recantation, on or before June 7, 2012, Mr. Dickerson

contacted Defendant Goldstien, who was still employed by the Contra Costa County

Public Defender's Office.  Mr. Dickerson advised Defendant Goldstein of Ms. Perry's recantation and requested Defendant Goldstein's help in overturning his conviction.

69.     On June 21, 2012, Defendant Goldstein requested that an investigator from the Contra Costa County Public Defender's Office interview Ms. Perry.  The investigator did so on July 31, 2012, and produced a written report dated August 9, 2012.  Ms. Perry told the investigator that, on or before April 20, 1998, the date she made the rape allegation against Mr. Dickerson, Ms. Perry was coaxed into an apartment by an 18-year-old named T.J., where she was sexually assaulted by T.J. and his cousin.  Ms. Perry told the investigator that "T.J. told her she better not tell on him.  She better make up a name but not him.  He told her what to do and to say, to leave her shoes."  Ms. Perry further told the investigator that "[h]er father came and picked her up [from Kragen Auto Parts].  When he got home he whooped her first.  At this point she was scared of her father, scared that T.J. would hurt her if she told on him, so she did what he told her."  Thus, T.J. told Ms. Perry to accuse Mr. Dickerson, and Ms. Perry did so.  Ms. Perry concluded by telling the investigator that that "[s]he is willing to assist in clearing Mr. Dickerson."

70.     On August 8, 2012, Defendant Goldstein reviewed the investigator's report and declared it "favorable to our cause [*i.e.*, overturning Mr. Dickerson's conviction]."  Over the next several months, however, Defendant Goldstein strung Mr. Dickerson along with apparently false reports of progress on his case, and then ceased communicating with Mr. Dickerson altogether after mid-2012.

71.     On June 27, 2013, Defendant Goldstein emailed colleagues in the Contra Costa County Public Defender's Office and made the case for abandoning Mr. Dickerson, citing: (i) "the long odds of prevailing" on a motion to vacate Mr. Dickerson's conviction; (ii) "we are not obligated to represent the guy [Mr. Dickerson] on this per govt code 27706(a) and (g)"; (iii) "it may be beyond our statutory duties as public defenders to represent him. Ie. [*sic*], we could be forced off by a zealous judge;" and (iv) "*my inability due to caseload constraints* to take this on wholly myself."

1   (Emphasis added.)  Defendant Goldstein concluded that, "in light of this . . . . I intend
2   to contact Mr. Dickerson and send him [a research] memo and state that we cannot
3   represent him further on the filing of a motion to vacate his plea due to our govt code
4   limitations.  Then give him a referral or two to free legal aid help along with []
5   research insights and wish him well."  However, Defendant Goldstien did not provide
6   any information or referral to Mr. Dickerson, and in fact had no further
7   communication with Mr. Dickerson about this or any subject.

8   72.    Upon information and belief, in or about November 2015, Defendant Goldstein
9   left the Contra Costa County Public Defender's Office and was appointed as a judge
10  of the Superior Court of California, County of Contra Costa.

11  **The Contra Costa County Public Defender's Office Ultimately Represents Mr.**
12  **Dickerson and Secures Vacature of his Conviction**

13  73.    Between 2012-2019, Mr. Dickerson repeatedly contacted Defendant Goldstein
14  and others within the Contra Costa County Public Defender's Office for assistance,
15  but received no response.

16  74.    Upon information and belief, in 2019, a newly appointed senior official within
17  the Contra Costa County Public Defender's Office contacted Mr. Dickerson and
18  offered to represent him in filing a motion to vacate his no contest plea and conviction
19  pursuant to California Penal Code section 1473.7(a)(2) on the grounds of actual
20  innocence.  Mr. Dickerson's matter was assigned to a new Assistant Public Defender.
21  In an internal email, the newly assigned Assistant Public Defender stated "it sounds
22  as though the CW [complaining witness, Ms. Perry] has recanted, *and forensics*
23  *undermine the conviction*."  As noted, upon information and belief, Defendant
24  Goldstein possessed the same forensic evidence in 1998 when he advised Mr.
25  Dickerson to plead no contest to the forcible rape charge.

26  75.    The newly assigned Assistant Public Defender prepared the motion to vacate.
27  The motion to vacate noted that, at the time of Mr. Dickerson's plea:

28

1    [T]here was no DNA evidence or physical injuries consistent with the

2    alleged forceful rape.

3    . . . .

4    No physical evidence corroborated Ms. Perry's version of the assault, nor

5    did any DNA evidence corroborate the false identification [of Mr.

6    Dickerson].

7    . . . .

8    Ms. Perry's false allegation was the only evidence the prosecution

9    offered at the preliminary hearing.

10   Exh. A, at 5, 10, 12.

11   76.    The Contra Costa County Superior Court heard the motion to vacate and, on

12   September 24, 2021, declared Mr. Dickerson actually innocent of the charge of

13   forcible rape and vacated his conviction.  The Court also granted the People's motion

14   to dismiss remaining counts against Mr. Dickerson, *nunc pro tunc*, in the interest of

15   justice pursuant to California Penal Code section 1385.  Exh. B.

16   77.    As a result of that ruling, Mr. Dickerson is no longer required to register as a

17   sex offender.  In addition, due to the vacature of his conviction, Mr. Dickerson was

18   able to enroll in trucking school – his lifelong aspiration – and graduated in or about

19   May 2022.  Mr. Dickerson secured employment as a truck driver in or about June

20   2022 and, after four weeks of training, will begin work with a starting salary of

21   $2,100 per week.

22

23                          **COMPLIANCE WITH**

24              **CALIFORNIA GOVERNMENT CLAIMS ACT**

25   78.    A claim for professional negligence against an office of the public defender and

26   an individual employee of a public defender's office constitutes a claim for personal

27   injury under and subject to the requirements of the Government Claims Act, Gov't

28   Code § 810, *et seq*., a/k/a the Tort Claim Act (hereinafter, "**Claims Act**").  Cal. Gov't

Code § 811.2; <u>Fantazia v. County of Stanislaus</u>, 41 Cal. App. 4th 1444, 1449-53 (1996).

**Mr. Dickerson Timely Filed a Claim with Contra Costa County**

79.     The Claims Act mandates that claims for money damage against a "public entity" be presented to that public entity within six months of accrual.  Cal. Gov't Code § 911.2.  "'[T]he date of the accrual of a cause of action to which a claim relates is the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no claim requirement."  <u>Fantazia</u>, 41 Cal. App. 4th 1444, 1449-50, quoting Cal. Gov't Code § 901.

80.     Mr. Dickerson's claim for legal malpractice did not accrue until September 24, 2021, the date on which the Superior Court of California, County of Contra Costa, issued its order vacating Mr. Dickerson's judgment of conviction due to actual innocence pursuant to Penal Code section 1473.7(a)(1).  Exh. B (Order vacating conviction).   Pursuant to Code of Civil Procedure section 340.6, as amended on October 11, 2009, and effective January 1, 2010 (see 2009 Cal. Legis. Serv. Ch. 432 (A.B. 316)), a claim for legal malpractice arising from a judgment of conviction in a criminal case "shall be commenced within two years after the plaintiff achieves postconviction exoneration in the form of a final judicial disposition of the criminal case."  Cal. Code Civ. Proc. § 340.6.  Because Mr. Dickerson's claim accrued on September 24, 2021, Mr. Dickerson's deadline for submitting a claim to the County under the GSA was six months after September 24, 2021, or March 24, 2022.

81.     Mr. Dickerson presented his claim seeking money damages arising from Defendants' professional negligence leading to Mr. Dickerson's wrongful conviction to the County Clerk on September 24, 2021, within the six-month deadline prescribed by the Claims Act.  Exh. C.

82.     The County denied Mr. Dickerson's claim on December 20, 2021 on the ground that "Your claim relating to a cause of action for death or for injury to a

person or to personal property or growing crops was not presented within six months after the event or occurrence as required by law.  (Government Code §§ 901, 911.2.).”  Exh. D.

**The County's Denial of Mr. Dickersons' Claim on Lateness Grounds Was Erroneous**

83.     The County's denial of Mr. Dickerson's claim on the grounds of failure to present within six months of accrual is erroneous.

84.     Under California law, “general rule for accrual of a cause of action sets the accrual date as . . . .  the time when the cause of action is complete with all of its elements . . . .”  Estate of Yool, 151 Cal. App. 4th 867, 877 (2007).  A claim for legal malpractice arising from a judgment of conviction in a criminal case requires proof, as an element of the claim, of the Mr. Dickerson's “actual innocence” of the crime.  Wiley v. County of San Diego, 19 Cal. 4th 532, 545 (1998).

85.     In 2001, the California Supreme Court declared that the “actual innocence” element must be established by “post-conviction exoneration.”  Coscia v. McKenna & Cuneo, 25 Cal. 4th 1194, 1199-1200 (2001).  Specifically, the California Supreme Court said “we hold that an individual convicted of a criminal offense must obtain reversal of his or her conviction, or other exoneration by postconviction relief, in order to establish actual innocence in a criminal malpractice action.”  Id. at p. 1201.  As noted, effective January 1, 2010, the California Legislature amended the statute of limitations in malpractice actions to permit the filing of actions for malpractice in criminal cases within two years of the date on which the plaintiff obtains the required exoneration by post-conviction relief.  The applicable statute of limitations now reads:

> An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of

1
2
3
4

the wrongful act or omission, whichever occurs first.  <u>If the plaintiff is</u>
<u>required to establish the plaintiff's factual innocence for an underlying</u>
<u>criminal charge as an element of the plaintiff's claim, the action shall be</u>
<u>commenced within two years after the plaintiff achieves postconviction</u>
<u>exoneration in the form of a final judicial disposition of the criminal</u>
<u>case</u>.

5
6
7
8
9

Cal. Code Civ. Proc. § 340.6(a).  Accordingly, Mr. Dickerson's claim for legal malpractice against Defendants did not accrue until September 24, 2021, the date on which the cause of action was "complete with all of its elements." <u>Yool</u>, <u>supra</u>.  Mr. Dickerson's claim, submitted on December 14, 2021, was therefore timely under the Claims Act.[1]

10

**Mr. Dickerson Timely Filed This Action**

11
12
13
14
15

86.    As noted, the County denied Mr. Dickerson's Claim on December 20, 2021. The Claims Act mandates that a cause of action for money damages arising from personal injury be filed in the Superior Court within six months of the denial, or June 20, 2022.  Cal. Gov. Code, § 945.6(a)(1).  Accordingly, Mr. Dickerson's legal malpractice claim against Defendants is timely.

16
17
18
19

**CLAIM FOR RELIEF**

**(Legal Malpractice Under California Tort Law)**

20
21

87.    Mr. Dickerson realleges and incorporates herein, as though fully set forth, each and every, all and inclusively, paragraphs 1 through 86.

22
23
24

88.    The elements of a legal malpractice action arising from a criminal proceeding are: (1) proof of actual innocence; (2) the attorney's duty to use such skill, prudence, and diligence as members of the profession commonly possess and exercise;

25
26
27
28

---

[1] Mr. Dickerson did not seek to pursue a late claim thorough a under Government Code section 946.6, because Mr. Dickerson contends that his claim was not in fact late.  <u>Rason v. Santa Barbara City Housing Authority</u> confirms that "a claimant who disputes the determination of untimeliness must raise that issue by filing suit rather than a section 911.4 application [and subsequent section 946.6 petition]."  <u>Rason</u>, 201 Cal. App. 3d 817, 822-23 (1988).

1  (3) breach of that duty; (4) a proximate causal connection between the breach and the

2  resulting injury; and (5) actual loss or damage resulting from the lawyer's negligence.

3  Coscia v. McKenna & Cuneo, 25 Cal. 4th 1194, 1199–1200 (2001).

4  89.  Mr. Dickerson obtained proof of actual innocence through post-conviction

5  relief on September 24, 2021.  See Exh. B.

6  90.  As Mr. Dickerson's appointed Assistant Public Defender, Defendant Goldstein

7  had a duty to use such skill, prudence, and diligence, as members of the legal

8  profession commonly possess and to exercise such in the defense of Mr. Dickerson in

9  the underlying action, People v. Dickerson.  Defendant Goldstein is not immune from

10 the claims asserted herein.  Barner v. Leeds, 24 Cal. 4th 676, 691–692 (2000).  In

11 addition, Defendant Contra Costa County is vicariously liable for the acts of

12 Defendant Goldstein within the scope of the latter's employment as an Assistant

13 Public Defender, under circumstances in which Defendant Goldstein is personally

14 liable.  Cal. Gov't Code § 815.2; Briggs v. Lawrence, 230 Cal. App. 3d 605 (1991).

15 In addition, Defendant Contra Costa County is directly liable to Mr. Dickerson by

16 virtue of its statutory duty to provide competent representation to Mr. Dickerson in

17 People v. Dickerson.

18 91.  Upon information and belief, Defendant Goldstein breached his duty to Mr.

19 Dickerson by, including but not limited to, the following:

20      a.  Failing to adequately prepare for Mr. Dickerson's defense at trial,

21      and instead providing Mr. Dickerson with a recommendation to enter a

22      no contest plea to a charge of forcible rape on the eve of trial when there

23      was no time left to prepare an adequate trial defense, and despite lacking

24      evidence of a basis in fact for the no contest plea.

25      b.  Failing to investigate evidence of Mr. Dickerson's alibi, including,

26      upon information and belief, by failing to interview alibi witnesses Angel

27      Carone and Billy Drinkwater, and failing to investigate surveillance and

28      other records from the BART system of Mr. Dickerson's whereabouts at

the time of the alleged assault.

      c.     Failing to provide Mr. Dickerson with the information necessary to reasonably inform his decision to plead no contest to a charge of forcible rape for which there was no physical evidence, including but not limited to the deficiencies listed immediately above, as well as by opining that Mr. Dickerson was likely to lose at trial because of Ms. Perry's identification of him, as well as her capacity to cry in a courtroom, without adequate consideration or explanation of the overwhelming evidence of Ms. Perry's mendacity and the available impeachment evidence.

      d.     Failing to consult with and/or secure an expert witness to testify regarding the medical and other forensic evidence.

In so doing, Defendant Goldstein deprived Mr. Dickerson of competent advice during plea negotiations, and deprived Mr. Dickerson of an effective choice between trying the case and pleading no contest to a charge of forcible rape for which there was no physical evidence, in violation of the duty of care.

92.     Defendant Goldstein's breach of his duty to Mr. Dickerson, as pleaded herein, proximately caused injury to Mr. Dickerson, as pleaded herein because:

      a.     Defendant Goldstein's deficient advice and recommendation to enter a no contest plea, along with Defendant Goldstein's manifestly deficient performance in failing to prepare adequately for trial, were the sole reasons that Mr. Dickerson entered a no contest plea, despite being actually innocent of the charges against him.

      b.     But for Defendant Goldstein's deficient advice and recommendation, and Defendant Goldstein's deficient performance, Mr. Dickerson would not have pleaded no contest, and would have insisted on going to trial.

1     c.     But for Defendant Goldstein's deficient advice and recommendation that Mr. Dickerson enter a no contest plea, despite being actually innocent of the charges against him, as well as Defendant Goldstein's deficient performance, there is a reasonable probability that Mr. Dickerson would have been acquitted at trial, given: (i) the complete absence of physical evidence of the alleged crimes; (ii) the plausible alternative theories for Ms. Perry's false identification of Mr. Dickerson; (iii) alibi witnesses and evidence; and (iv) Ms. Perry's manifestly impeachable identification of Mr. Dickerson as her assailant.

93.     Defendant Goldstein's breach of his duty of Mr. Dickerson caused injury to Mr. Dickerson, including but not limited to:

     a.     A felony conviction for violent rape that Mr. Dickerson did not commit.

     b.     The requirement to register as a sex offender for over 22 years.

     c.     Loss of employment opportunities.

     d.     Loss of educational opportunities.

     e.     Loss of stable living arrangements and consequent homelessness.

     f.     Fear of vigilante attacks, social opprobrium, and harassment.

     g.     Physical and emotional harm.

94.     The injuries caused by Defendant Goldstein's breach of his duty to Mr. Dickerson lasted for 22 years, 9 months, and 21 days, comprising the period of December 4, 1998, the date of the plea, and September 24, 2021, the date that the Superior Court of California, County of Contra Costa vacated Mr. Dickerson's conviction on the grounds of actual innocence.

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jermaine Demel Dickerson prays for judgment against Defendants Contra Costa County and David E. Goldstein for:

    A.    Economic monetary damages in an amount exceeding $75,000;

    B.    Monetary damages for emotional distress, pain, and suffering in an amount exceeding $75,000; and

    C.    For any other relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Jermaine Demel Dickerson demands a jury trial in this action as to all issues so triable.

Dated: June 8, 2022            LAW OFFICE OF JANICE M. BELLUCCI

By: _____
        Janice M. Bellucci
        Attorney for Plaintiff
        Jermaine Demel Dickerson

**COMPLAINT**